UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA

   -  against –

MARTIN WEISBERG,

               Defendant.

--------------------------------------------------------x

07 CR 641 (S-2) (NGG)
08 CR 347 (NGG)

## MARTIN WEISBERG'S SENTENCING MEMORANDUM IN RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM

George A. Stamboulidis
Lauren Resnick
Essence Liburd
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Elkan Abramowitz
Richard F. Albert
Morvillo Abramowitz Grand
Iason & Anello, P.C.
565 Fifth Avenue
New York, New York 10017

Defendant Martin Weisberg respectfully submits this memorandum in reply to the government's Sentencing Memorandum, dated May 31, 2013 (the "Gov't Memo.").

## PRELIMINARY STATEMENT

Marty Weisberg stands before this Court for sentencing having pleaded guilty to two separate felonies, filled with shame and utterly disgraced, his own actions and serious lapses of judgment having betrayed his talent and a legal practice built up painstakingly over the years. He knows that he has no one but himself to blame for his current circumstances, and he stands ready to accept this Court's judgment.

As reflected in the parties' various prior submissions in connection with sentencing, Marty admits both to his crimes and to the facts underlying those crimes; those facts are set out in the paragraphs of the Presentence Report relating to the SIAM conduct (with only minor objections) and in the statement of agreed facts regarding the PIPEs conduct, submitted to the Court on May 6, 2013. In summary, with respect to the SIAM case, Marty admits having converted funds in the SIAM escrow account for his personal benefit without the client's knowledge at the time of the transfer. In the PIPEs case, in summary, Marty admits conspiring with others and participating in the filing of disclosure statements with the SEC that did not accurately describe aspects of certain PIPEs transactions, in particular, falsely characterizing as a finder's fee a 3.5% discount agreed to with PIPE investors.

The uncontested facts regarding Marty's criminal conduct, the personal history and background set forth in Presentence Report and the uncontested facts contained in Marty's Sentencing Memorandum ("Weisberg Sent. Memo.") and attachments, along with the argument of the parties, contain more than ample basis for the Court to sentence Marty. That is

particularly so in the unusual circumstances of this case, where the government has agreed not to seek a Guidelines sentence.

In its Sentencing Memorandum, however, the government has also set forth a number of factual allegations – some longstanding, and some new, some relating to the original charges, and others wholly unrelated to them – that are incorrect. Some allegations are out-and-out false, some are misleading partial truths, some are based on incorrect or unsettled legal interpretations, some relate to conduct of others of which Marty was unaware, and some are a mixture of all of the above. Marty objects to the additional facts set forth in the government's Sentencing Memorandum and maintains his objections set forth in his March 6, 2013 letter to Probation Officer Lisa Langone, except as partially modified by the May 6, 2013 statement of agreed facts. Such objected-to factual claims may not be taken into account in sentencing.

We submit this reply memorandum not to detail every respect in which the objected-to factual allegations are inaccurate, nor to refute every single such allegation, nor to marshal all of the existing evidence that militates against the government's claims. We rather summarize some of the most significant factual and legal problems with the government's claims. Our purpose is to give the Court a more balanced and fair portrayal of Marty's conduct and to give a sense of the highly contested morass that Marty intended to spare the Court, the government and himself through his guilty plea.

We also respond herein to some blows directed at Marty that are gratuitous and unfair. We submit that those efforts, combined with some of the demonstrably incorrect or misleading new assertions against him, betray on the part of the government an excessive willingness to accept unexamined criticisms of Marty, as well as a degree of anger toward Marty that is unjustified and inconsistent with the spirit of the plea agreement.

2

I.      **The PIPEs Case**

The vast majority of the government's allegations regarding the PIPEs case have always been hotly contested, as reflected in the detailed objections that Marty has previously submitted to Probation and to the Court.  Indeed, the government effectively abandoned the overwhelming majority of its factual allegations in reaching a plea agreement with Zev Saltsman pursuant to which it stipulated to a Guidelines loss amount of less than $400,000 and in agreeing to dismiss all criminal charges against alleged co-conspirators Steven Newman and Edward Newman pursuant to deferred prosecution agreements.

To support the factual allegations it persists in asserting against Marty, the government submits numerous exhibits, including certain of Jordan Young's FBI Reports, an excerpt from one day of Marty's SEC testimony, and various other documents.  Upon examination, however, these exhibits do not establish the facts alleged by the government. Moreover, the government has cherry-picked the statements and documents it has submitted to the Court—ignoring numerous other witness statements and documents that contradict or are inconsistent with the government's version of the facts.

Among the alleged facts set forth by the government that Marty contests are: (1) Marty's alleged knowledge of Zev Saltsman's and Menachem Eitan's "control" of the entities investing in the PIPE transactions; (2) the alleged corrupt payments made to Marty by Saltsman and Eitan; and (3) Marty's alleged knowing false statement to the SEC in or around September 2003 related to certain Ramp PIPE transactions.

A.      Marty Weisberg Did Not Know that Saltsman and Eitan "Controlled" the PIPE Investment Entities

The government asserts that the entities that invested the Ramp and Xybernaut PIPEs (the "Investment Entities") were legally controlled by Saltsman and Eitan and that Marty

3

knew it.  *See* Gov't Memo. at 9.  The government does not mention that in each PIPE

transaction, the Krieger & Praeger law firm – highly experienced U.S. securities counsel –

represented Saltsman, Eitan and the Investment Entities.  The government also does not mention

that in each PIPE transaction, Krieger & Praeger represented to Marty's clients (either Xybernaut

or Ramp) and to the lawyers working with Marty the identity of the natural person who had legal

control of each such entity, and each such person was someone other than Saltsman or Eitan.

It is not uncommon in the world of PIPE investing for the investors to be entities

holding funds from a group of individuals or other entities, and for such investing entities to be

organized such that they have advisors who play a major role in their investing activities, but

who do not have legal control over such entities.  That is what the Krieger & Praeger law firm

represented to Marty's clients in each transaction, and that is what the Krieger & Praeger

lawyers, Marty's law partner, and Marty testified under oath before the SEC that they believed in

this case.  To support the contrary premise, the government relies on FBI reports of statements

by one witness, Jordan Young, a former associate of Marty, whom the government was seriously

threatening to prosecute before he agreed to cooperate against Marty and others.  Even if he were

not communicating indirectly through the words of the FBI agent who prepared the report, Mr.

Young, of course, would not be competent to say what Marty "knew."  And indeed, the very FBI

reports upon which the government relies are not consistent on this critical point.

Marty has consistently maintained that he knew the Investment Entities were

associated with Saltsman and Eitan in some capacity but that he believed that Saltsman and Eitan

acted as advisors to the entities and to his knowledge Saltsman and Eitan were not themselves

the investors.  *See* Exh. 1 (Weisberg Aug. 10, 2005 SEC Transcript) at 131; Exh. 2 (Weisberg

Sept. 23, 200 SEC transcript) at 10.  This is consistent with the SEC testimony of Samuel

4

Krieger, one of the better-known lawyers in the PIPEs area, who represented Saltsman, Eitan, and the Investment Entities in these transactions. Krieger described Saltsman as "an investment advisor for various individuals and/or entities [who] on behalf of clients of his … [would] cause to be made investments in various types of investments …[including PIPEs]." Exh. 3 (Krieger SEC Transcript at 4, 5). Similarly, the attorney testified that Eitan was "an associate of … Saltsman who works together with him … in terms of investment advisory services that [they] provide to various clients." Exh. 3 at 7.

Likewise, the lawyers that worked with Marty on PIPE transactions for Ramp and Xybernaut also testified that they relied upon the representation that the Investment Entities' were the investors and did not know Saltsman to have a role beyond advisor. Thus, Chris Auguste, Marty's former partner who is now a partner at Kramer Levin Naftalis & Frankel LLP, testified that Saltsman had "investors that he represented" and that he did not "make any assumptions as to whether [Saltsman] was a principal" because the investors "have placement agents. They have agents who are … finding deals for them." Exh. 4 (Auguste SEC Transcript) at 22, 23-24. Auguste further testified that as counsel to the issuing company, he was not in a position to do other than rely on representations made to him on behalf of the investors regarding the identity of the investors. *Id.* at 110-12.[1]

Indeed, even Jordan Young, on whom the government relies, stated that he did not know whose money was used for the investments and that it could have been "Saltsman's and Eitan's or their friends or both." Gov't Memo. Exh. B at 2. Moreover, the portion of Young's

---

[1] This is consistent with the testimony of the other members of the legal team who worked with Marty in representing Xybernaut and Ramp, the issuing companies that received the PIPE investments. They knew that Saltsman (and Eitan) were associated with the PIPE Investment Entities and played a role in their investment decisions, but they did not know what Saltsman and Eitan's actual legal roles were with respect to the Investment Entities.

statement the government relies on to assert that "Weisberg knew that Saltsman and Eitan controlled the entities, and he understood that they were primarily investing Eitan's money" (Gov't Memo. at 9), makes no mention of Marty at all. Rather the FBI report simply indicates that Young was told by a third party that that money Saltsman invested was mainly Eitan's. The FBI report does not state that Young relayed this hearsay to Marty. And even if it were the case that funds came from Eitan, that simply would not mean that Saltsman or Eitan had legal control over the Investment Entities, if for example Eitan's funds had been put under the control of the trustee of a family trust or some other legal structure, and the Investment Entities were properly organized, like many other entities that invested in PIPE transactions were, so that the investment advisors did not have legal control of them.[2]

In short, just as their own lawyers did, Marty was entitled to rely on the repeated representations of Saltsman, Eitan and the Investment Entities that Saltsman and Eitan were advisors to, and not the "control persons" of, these entities. The government's claim to the contrary, which is a central underpinning of their broader case, is not correct.[3]

_____

[2] The government also relies on Young's mistaken speculation as to why Saltsman and Eitan might have used the Investment Entities to make the PIPE investments. *See* Gov't Memo at 6 (citing Gov't Exh. B). Whether or not the Investment Entities were required to be "grouped" together for purposes of Section 13(d) of the Exchange Act – which cannot be determined based solely on the fact that the Investment Entities had the same investment advisor – would not affect the Investment Entities' ability to trade unless their combined beneficial ownership of common stock exceeded 10% of the outstanding common stock of the company (i.e., warrants would not be included). Because almost all of the PIPE transactions at issue here included "conversion cap" provisions in the transaction documents, the warrants that the Investment Entities received cannot be considered in determining percentage of ownership. The conversion cap provisions prevented the Investment Entities from converting their warrants into shares if doing so would result in the investor owing more than 4.99% of the outstanding shares. Courts in the Second Circuit have consistently held that "[w]here an investor's rights are limited … a holder of convertible securities may not be deemed the beneficial owner of the underlying common stock [for purposes of Section 13(d)]." *Global Intellicon Inc. v. Thomson Kernaghan & Co.,* No. 99 CIV 342, 1999 WL 544708, at *15 (S.D.N.Y. July 27, 1999); *see also Levy v. Southbrook Int'l Invest. Ltd.,* 263 F.3d 10, 15 (2d Cir. 2001) (in determining beneficial ownership for purposes of Section 13(d), the focus should be on the "powers and rights" of the investors and the "right" to acquire the underlying security).

[3] Mr. Young's FBI reports also reflect a number of other accusations against Marty that are incorrect and contradicted by other witnesses.

B.   The Claim that Marty Received $1.4 Million in Corrupt Payments from Saltsman and Eitan, Which the Government Did Not Assert in Connection With Saltsman's Guilty Plea or Sentencing, Is Wrong

Marty has consistently denied receiving corrupt payments from Saltsman and Eitan, and such payments have been consistently denied by everyone alleged to be involved in them, including Zev Saltsman, the purported payor.[4]  Indeed, the government accepted Saltsman's guilty plea in this case and agreed to a loss amount for Guidelines purposes that did not include these alleged corrupt payments, which the government was not permitted to do under Department of Justice policy and under the Guidelines if in fact such conduct was readily provable.  *See* Weisberg Sent. Memo. at 25 n. 5.  The government also did not address this alleged conduct in connection with Saltsman's sentencing before this Court.  Nevertheless, the government again asserts in its Sentencing Memo that Marty received $1.4 million in "kickbacks" from Saltsman and Eitan.[5]  *See* Gov't Memo. at 11-14, 23 n.13.  This claim is simply wrong.[6]

---

[4] The government also references a cash payment that Saltsman and Eitan made to Andrew Brown, which Marty did not learn about until well after the fact, after Brown disclosed it to other attorneys at Marty's law firm in the course of their preparing him to testify.  The government's claim that such payment was "never disclosed to the investing public" (Gov't Memo. at 11) is incorrect.  Under the guidance of Marty's law firm, in May 2005 Ramp publicly disclosed the payment to Brown.  In that press release the company stated that Brown had received an unsolicited gift from the advisor to several of the company's investors.

[5] Special Litigation Counsel to Xybernaut ("Xybernaut Counsel") submitted a letter to the Court on April 12, 2013 seeking on behalf of Xybernaut the $250,000 that Marty agreed to forfeit in connection with his plea.  In addition, Xybernaut Counsel submitted an affidavit and expert report that purports to describe the alleged damages caused by Marty and others and asserts more than $68 million in loss.  Marty takes no position on the issue of who should receive the money he has forfeited.  However, with respect to the alleged loss to Xybernaut, this Court should reject the $68 million loss amount, as it properly did previously when Xybernaut Counsel presented the identical affidavit in connection with Saltsman's sentencing.  Indeed, the one court that considered in detail the conclusions reached in the expert report referenced in the affidavit found that it was "as a matter of law … irrelevant and [had] no substantial foundation …that simply [had] no factual basis in the record" and was not based on "any [relevant] scientifically valid surveys." (*Xybernaut Corp. v. Grant Thornton*, Transcript of Ruling, Circuit Court of Fairfax County, Virginia, October 23, 2008)

7

The sums Marty received were the proceeds of a loan. Marty entered into a loan agreement with the trust formed by Steven Newman. *See* Exh. 1 at 117-18. The loan was contemporaneously documented in a detailed loan agreement. *See* Exh. 5 (Loan Agreement). To secure the loan, Marty pledged valuable assets – namely, his shares in United Stations Radio Network ("United Stations"), a privately held corporation that Marty invested in years earlier. That pledge of assets was also documented at the time. *See* Exh. 6 (Pledge Agreement); Exh. 1 at 118.

The loan has been repaid in its entirety. Marty made an initial payment on the loan on or about June 15, 2005, the first time that a payment was required under the terms of the loan agreement. He made an additional payment in June 2006. *See* Exh. 7 (Wire transfer notices). The remainder of the loan was satisfied by Marty's agreement to surrender the collateral he pledged, which was the United Stations stock. *See* Exh. 8 (Assignment Agreement). These United Stations shares are valued at between $2 and $3 million, which is more than sufficient to satisfy the remaining balance on the loan.[7]

The claim that Marty received corrupt payments from Saltsman and Eitan has been denied by all of the parties allegedly involved. Prior to his guilty plea, the government repeatedly and at length interviewed Saltsman, an alleged payor of these alleged corrupt

---

[6] The government even asserts that Marty admitted such conduct in his plea allocution, Gov't Memo. at 23 n. 13. In fact, Marty refused to include any such "admission" in his allocution and has at all times consistently maintained that he did not receive any corrupt payments from Saltsman and Eitan. The government's assertion amounts to a claim that Marty somehow admitted to the highly contested, unproven centerpiece of the government's case, but that he did so in the secret code of a general reference to related party transactions, and that he thereby agreed to conduct resulting in a "loss" for Guidelines purposes that is directly at odds with the position on loss he took in his contemporaneously signed plea agreement and that he has taken at all other times. The most charitable way to characterize the government's assertion is that it is incorrect and disingenuous.

[7] Accordingly, as discussed below, contrary to the government's claim, Marty's statement to Probation that he no longer has an ownership interest in United Stations is accurate.

payments, and Saltsman denied that he paid a kickback to Marty.[8] *See* Exh. 9 (Gov't *Brady*
Disclosure Letter). Naimer, who acted as trustee for Steven Newman's trust, also served as an
attorney for Saltsman and Eitan and had access to their accounts. Naimer has admitted that he
mishandled the funds and used funds from Saltsman's and Eitan's accounts instead of the trust
accounts to disburse the loan money to Marty and Steven Newman. Marty was not aware of
Naimer's actions in mishandling these funds; apparently Saltsman also was not.

      C.     Marty Did Not Lie to the SEC in September 2003 Regarding
              Ramp PIPE Transactions

      The government asserts that Marty knowingly made false statements to the SEC
regarding certain Ramp PIPE transactions in September 2003. *See* Gov't Memo. at 14-18. As
Marty has explained in SEC testimony, he believed at the time that certain statements he made in
a September 2003 letter to the SEC, written immediately after he first began representing Ramp,
were correct, but he later came to believe that they were not.

      On or about September 23, 2003, Marty was contacted about representing Ramp
in connection with certain PIPE transactions. Prior to that time, Marty had no involvement with
Ramp. Marty met with Ramp president Andrew Brown; Ramp's longtime outside counsel Peter
Hirschfield, who had been representing Ramp in connection with these financing transactions;
Saltsman; Saltsman's lawyers from Krieger & Praeger; Marty's associate Jordan Young; and
others to discuss a comment letter Ramp had received from the SEC in connection with a
registration form it had filed in June 2003. *See* Exh. 10 (Weisberg Dec. 10. 2005 SEC
Transcript) at 21-26. The comment letter included a question related to other deals that had been
done since the registration statement had been filed. During the course of that meeting, Marty

---

[8] We believe that the government has additional facts from Saltsman explaining the mishandling of the
funds used to disburse the loan proceeds. The government has disclosed to the defense only the bare
bones statement that Saltsman "denied in substance that he paid a kickback to Martin Weisberg or Steven
Newman in connection with the PIPE transactions charged in the superseding indictment." *See* Exh. 9.

was informed that after Ramp filed a registration statement in June 2003, Ramp and certain investors had negotiated other PIPE transactions, funds had flowed from the investors to Ramp, but that the transactions had not been finalized or closed. *See id.* at 27-31, 103.  It was discussed among counsel and the parties that because the transactions had not actually been finalized, they could be treated as debt financing. *See id.* at 30, 33-34.

Thus, on or about September 29, 2003, Marty submitted a letter to the SEC that stated that Ramp had not and was not making any offers of its securities during the pendency of the June 2003 registration statement.  Before sending the letter to the SEC, it was circulated among the Krieger & Praeger attorneys representing Saltsman, Eitan and the Investment Entities, and Hirschfield, Ramp's longtime attorney, all of whom were fully familiar with the facts and circumstances of these transactions.  These attorneys raised no concern about the content of the letter.  Indeed, Hirschfield, who was intimately familiar with Ramp and the details of the financing transactions, praised the letter as "excellent." *See* Exh. 11 (Hirschfield email).  Marty who was new to representing Ramp and who had known Hirschfield for years, relied on that approval.

Sometime after Marty sent the September 2003 letter, Marty was informed by an attorney working with him that the later Ramp PIPE transactions may have closed after the filing of the June 2003 registration statement.  Marty's colleague had received a signature page from one of the alleged PIPE transactions. *See* Exh. 10 at 73-76.  Between the end of September and November 10, 2003, Marty and others at his firm concluded that Ramp had actually entered into certain PIPE transactions after the June 2003 registration statement. *See* Exh. 10 at 117-118).  After reaching such a conclusion, Ramp and the PIPE investors agreed to rescind the transactions

and to treat them as a nullity. Marty's firm prepared the waiver and termination documents related to those PIPEs.

The government cites Young's FBI Report in support of its claim that Marty knew that that the statements in the September 2003 letter were false. Specifically, the government alleges that Marty signed the letter to the SEC because Young told Marty that Young would not sign it because it was "blatantly false." *See* Gov't Memo. at 16 (citing Gov't Exh. A). The Young FBI Report, however, does not say that Young ever told Marty that the letter was false. Rather, the FBI Report stated that Young would not sign the letter and Marty "knew why." Young goes on to state that he believed the letter was inaccurate and specific parts of it were false. *See* Gov't Memo. Exh. A at 4. Moreover, in a second FBI Report, Young asserted that he believes that Marty does not think he did anything wrong. *See* Gov't Memo. Exh. B at 3. Marty has explained at length in his testimony why the latter is the case.

Indeed, in 2004, the law firm at which Marty was employed conducted an inquiry regarding claims that had been raised regarding the accuracy of the September 29, 2003 letter. After reviewing the facts and speaking to the parties involved, the law firm's inquiry did not find that any wrongdoing had occurred. *See* Exh. 10 at 71-72; Exh. 12 (Weisberg April 21, 2006 SEC Transcript) at 100-101.

Simply put, at the time Marty submitted the letter to the SEC he believed the statements in the letter were accurate. Because this was Marty's first involvement with Ramp, he relied on Ramp's former counsel, counsel to the investors, Saltsman and Eitan, and the individuals at the company, to confirm the correct facts.

11

D.   Alleged Facts Concerning the PIPEs case that are Irrelevant or Not
     Attributable to Marty

In addition to including factually incorrect claims in its Sentencing Memorandum,
the government devotes significant portions of its Memorandum to facts that Marty did not and
could not have known or that are irrelevant to Marty's culpability, such as the trading of the
PIPE shares, and the movement of stock and money among accounts to which Marty had no
access.

For example, the government asserts that Saltsman and Eitan used Canadian
brokerage accounts to accumulate short positions in Ramp and Xybernaut prior to the effective
date of the registration statement.  The government further alleges that Saltsman and Eitan
executed wash trades between the Canadian accounts and their domestic accounts.  The
government asserts that Marty "was aware of Saltsman's short selling activities."  Gov't Memo.
at 18 n. 10.

That Saltsman, Eitan, and/or the Investment Entities were selling their PIPE
shares, and taking short positions to do so, would hardly be surprising to anyone experienced in
this form of financing.  It is common knowledge that investors in PIPEs typically sell their shares
to realize profits on their investment, and that they often take short positions as part of their
selling activities.  There is typically nothing illegal or improper about PIPE investors doing so.
*See ATSI Communications v. Shaar Fund, Ltd.,* 493 F.3d 87, 101 (2d Cir. 2007) (discussing
general legality and beneficial economic effects of short selling; dismissing claims based on
alleged manipulative short selling in connection with convertible preferred stock financings).
Indeed, here, the government makes no allegation that Saltsman and Eitan were illegally short
selling.  In fact, to the contrary, the government previously acknowledged in an affidavit
submitted to a court in the United Kingdom that "[t]he aspect of the Government's case that

12

involves the … method of trading, that is the 'short selling' of the securities is not alleged as a criminal violation," and that in this case the government was not alleging a "fraudulent trading scheme." Exh. 13 (Supplemental Affidavit in Support of Request for Extradition of Zev Saltsman) at ¶¶ 7-8. In any event, whether Saltsman and Eitan were shorting the stock in compliance with applicable rules or not was not Marty's responsibility. Saltsman, Eitan and the Investment Entities were represented by their own securities counsel – Krieger & Praeger. Mr. Krieger and his firm have never been charged with any wrongdoing by the government or the SEC in connection with this matter.

Similarly, the government asserts that the majority of the proceeds from Saltsman's and Eitan's brokerage accounts were transferred to an escrow account for Beeston Investments at the law firm of Krieger & Praeger – the firm that acted as counsel to Saltsman, Eitan, and the Investment Entities. The government does not allege that Marty had any knowledge of this fact. Mr. Krieger, in his testimony before the SEC, explained that he believed the Beeston Investments account was used by Saltsman to do "his accounting and reconciliation for … investment that he did for his clients with our office … [it was] merely a holding company for funds." *See* Exh. 3 at 16-17.

Just as Marty had no knowledge of the movement of stock and money in the accounts of Saltsman, Eitan, and Krieger and Praeger's escrow accounts, he also had no knowledge of the movement of money from the Samira Management account to accounts for Steven Newman. *See* Gov't Memo. at 13. Indeed, the government makes no allegation that Marty had any involvement in or knowledge of the transfer of these funds.

Accordingly, the Court should reject these alleged facts presented by the government for the additional reason that they are irrelevant to Marty.

13

## II.     The SIAM Case

Marty fully accepts responsibility as well for his conduct in the SIAM case, but objects to the government's characterization of certain limited facts in connection with that matter. First, and importantly, it is undisputed – and worthy of repetition here – that Marty paid back the full amount of the funds withdrawn plus interest months before he was indicted in the SIAM case. The victims have been made fully whole, and there is no loss in that case.

Without offering witness testimony or other support, the government's Sentencing Memorandum suggests that the Oceanic indemnity letter obtained by Marty in June 2007 during the course of the withdrawals is fraudulent. This is not true. Indeed, the signatory to that indemnity letter has affirmed that he executed the letter agreement at or around the June date reflected thereon in response to a request from Marty. The government's accusation about the indemnity, and the indemnity itself, is not referenced in the PSR. Marty contests the government's characterization, and the Court may only consider the facts set forth in paragraphs 6-17 of the PSR in connection with the SIAM case.[9]

Further, despite the government's repeated references in its Sentencing Memorandum, we remind the Court that Marty was not charged with committing a crime in connection with the TriState security arrangement. Marty objects to the government's description of this uncharged conduct. As described in a previous motion in this matter, the surety who retained Marty as his agent to secure the TriState funds did not execute the draft

---

[9]A partner at Baker & McKenzie, the law firm where Marty was employed at the time of the SIAM matter, has submitted a letter to the Court at the prosecutor's request. *See* Letter of William Linklater, dated March 29, 2013. To the extent that letter suggests that Marty engaged in other misconduct that is not part of the factual record in this proceeding, Marty disputes those statements and innuendos and objects to their consideration in sentencing. Indeed, the letter acknowledges that the Court has not heard evidence or made factual findings about these unrelated allegations, and the firm has no interest in doing so. (Linklater Letter at 3).

14

escrow agreement and provided no direction as to how Marty should maintain the funds.[10]  The suretor advised us that Marty's deposit of the funds in a Certificate of Deposit was not inconsistent with his request or Marty's obligations in that matter.

### III.    The Other Escrow Related Accusations Are Not Fair or Accurate

The other escrow related matters referenced in the government's Sentencing Memorandum have no relationship with the crimes charged in these cases, are based on unsubstantiated claims by persons who do not or barely know Marty, and are incorrect.  These wholly unrelated allegations reveal the government's excessive willingness to accept unexamined criticisms of Marty and proffer them to the Court.[11]  Marty objects to these unfounded escrow related accusations, which seek to unfairly taint him before the Court.

Of the 29 exhibits attached to the government's 54-page submission, the only affirmation is from Andrew J. Maggio, an individual who has no connection to the crimes to which Marty pleaded guilty and by his own admission has had only one fleeting interaction by telephone with the defendant.  *See* Gov't Memo. Exh. CC.  Mr. Maggio concedes that he had no prior dealings with or knowledge of Marty, understood a lawyer named James Trimble was holding the collateral for PS Trust, and it was Mr. Trimble who passed him along to Marty when confronted with a demand for reimbursement.  The government suggests impropriety on Marty's part because he advised Mr. Maggio that he was not holding funds for PS Trust and had limited

---

[10]  Paragraph 16 of the PSR fails to note that the TriState escrow agreement was in draft form, unsigned, and not effective or binding without signature of the interested parties by its own terms.

[11]  This is perhaps best illustrated by the government's attempt to re-characterize Marty's otherwise impressive work history, during which he served as a partner at several major law firms.  The government's sentencing memorandum even seeks to undermine those accomplishments, referring repeatedly and inappropriately to Marty's acquittal in a 1991 case, which has nothing to do with the cases before the Court.  As this Court well knows, Marty may not be sentenced based on acquitted conduct absent evidence of wrongdoing in connection with the circumstances underlying that matter.  The government proffers nothing but seeks to improperly taint Marty with the fact of a 22-year old indictment that made allegations that were rejected by a jury.

involvement with Oceanic at this time.  Both of these statements are true.  Marty was not a lawyer for PS Trust, did not hold funds for the transaction, and had not worked on any transaction for Oceanic for months at that time, with the principal engagement having been a potential insurance company deal years before.

Nor does the other escrow related complaint (*see* Gov't Memo. Exh. V) warrant consideration by the Court.  Marty had no involvement with this Sunvest, Inc. transaction.  There are no communications to or from Marty concerning this matter, and the proffered documents are signed by *someone other than Marty* as attorney-in-fact.  Marty was not aware that Oceanic used his name as a US dropbox on the performance bond, and the complainant had no contact with Marty because Marty was not involved.

## IV.    Incorrect Factual Claims Concerning United Stations Radio Network

In its Sentencing Memorandum the government makes a number of incorrect or misleading factual allegations that relate to United Stations.  United Stations is a private company, co-founded by Dick Clark, that is one of the largest independently owned and operated radio networks in the United States.  Marty was outside counsel to United Stations' predecessor companies, served as United Stations' outside counsel since its inception in 1994, and also held non-voting shares in the Company.

The source of the government's allegations appears to be an individual named David Kolin, a United Stations shareholder, and former executive and director.  After trying unsuccessfully for a long period to buy the Company, Kolin started making a variety of allegations against the Company's management, announced his resignation as an employee, sued the Company, and soon thereafter joined one of the Company's largest competitors.  Kolin has made a number of accusations against United Stations' management, many of which are

irrelevant to his legal claims, and some of which seem intended to embarrass and exact revenge against United Stations executives and persons associated with them, including Marty.  At a May 16, 2013 meeting (*see* Exh. 14 (notice of shareholders meeting)),[12] all of the United Stations shareholders who hold voting stock, other than Kolin, unanimously voted Kolin off the Company's board based on his having gone to work for a major competitor.  The litigation that Kolin has pursued against the Company has been acrimonious and is ongoing.

The government asserts two principal allegations relating to United Stations.  The first is that Marty made false or misleading statements to Probation when he told Probation that his stock in United Stations had been foreclosed upon and that accordingly "he no longer has an ownership interest in the company."  Gov't Memo. at 43.  This allegation is incorrect.  As noted above, and as demonstrated by documents produced to the government years ago in the early stages of this investigation, and as Marty testified before the SEC, Marty provided his United Stations shares as collateral to secure his loan from Steven Newman's trust.  *See* Exhs. 5-6.  By means of an assignment agreement, Marty agreed to surrender this collateral to the trust to pay off the loan.  *See* Exh. 8.  Accordingly, Marty's statements to Probation that he no longer has an ownership interest in United Stations were accurate.

The government's second principal false allegation concerning United Stations is that, during a meeting with United Stations' shareholders after his guilty plea in this case, Marty "stated that the only thing he regretted was that he lied under oath to make the case go away" and "maintained his innocence."  On the contrary, as described by United Stations shareholder Stephen Robertson, who participated in the meeting, when he addressed the group, Marty was

---

[12] United Stations' President and COO James Higgins called such meeting and ran it.  Marty did not. Marty is not Secretary of the Company; he served as secretary of this meeting at Higgins' request.  Marty does not control any group of United Stations shareholders.  His primary role at the company over the years was as trusted outside advisor.  Since giving up his law license, the company has continued to engage him as a consultant.  *See* Exh. 15 (Robertson Declaration) at ¶¶ 8-10.

"was emotional and apologetic," spoke about his "deep embarrassment" and was "quite humble and contrite." Exh. 15 at ¶ 6. Marty did not maintain that he was innocent or state that he had lied in his plea in order to make the case go away, nor did he make any reference to any particular potential witness against him or the race of any such witness. Exh. 15 at. ¶ 7. At other times after his guilty plea, while still grappling with his own emotions about pleading guilty after having spent so much energy fighting this case for so long, Marty spoke to others at United Stations about how difficult that transition was, and how the government had made accusations against him that he still maintained were exaggerated and inaccurate. But he did not assert that he was not guilty of the crimes to which he pleaded guilty.

## V.   The Government's Failure to Address the Outcomes for Other Defendants in the PIPEs Case

Although the government addresses the need to avoid unwarranted sentence disparities among defendants, conspicuously missing from the government's Sentencing Memorandum is any reference to the outcomes of the PIPEs case for Marty's co-defendants. The government fails to discuss that Saltsman – the top defendant on the indictment – who pleaded guilty to a one count superseding information, has already been sentenced by this Court to three years of probation and community service. In connection with Saltsman's sentencing, the government agreed that the loss amount was not greater than $400,000 – not the $4.1 million that the government asserts here. The government did not rely upon the alleged corrupt payments to Marty and Steven Newman, even though Saltsman was the alleged payor or co-payor of those payments, and under the government's theory, Saltsman (and Eitan) made such payments to repay Marty and Steve Newman "for "causing Xybernaut to enter into the PIPE

18

transactions" with the Investment Entities, which according to the government, provided millions of dollars in profits to Saltsman (and Eitan).[13]

Similarly, the government makes no mention of the fact that Edward Newman and Steven Newman received deferred prosecution agreements, leading to the dismissal of the charges against them in this case. Nor does the government state that it has never sought extradition of Eitan.

While we recognize that of course there are differences in the circumstances relevant to Marty as compared to these other defendants, the government's failure to even mention them while arguing about "the need to avoid unwarranted sentencing disparities" among similarly situated defendants is telling. We respectfully submit that in determining Marty's sentence, consideration of the outcome of this prosecution for Zev Saltsman, Menachen Eitan, Steven Newman and Edward Newman is of far greater importance than anything set forth in the government's Sentencing Memorandum.

## VI.   Marty's Medical Condition and Other Supportive Letters

As we previously advised the Court, on March 1, 2013, Marty had a heart attack. A stent was inserted in his principal coronary artery that was 99% blocked in an angioplasty procedure. He has additional blockages in his other arteries and remains on a strict regimen under the supervision of his medical doctors. Marty takes medication for this condition and is undergoing an aggressive rehabilitation program under the close monitoring of his doctors. *See* Exh. 16 (April 30 Dr. Keating letter). At the time of his attack, Marty was subject to particular stress associated with this case; indeed, it occurred on the very day that his counsel was meeting with the prosecutors to discuss some important issues. His treating physician, Dr. Keating, has

---

[13] Of course, the PIPE transactions incontestably provided Xybernaut, a money-losing start-up company, with the financing that it needed to remain in business.

pointed out the "well-recognized relationship between stress and depression and negative outcomes among patients with coronary artery disease," and notes that "avoid[ing] unnecessary stress will only aid in [Marty's] recovery." *Id.*

   Along with the medical letters, we attach additional letters that Marty received from people in his life who truly know him apart from the events that bring him to this Court. These letters demonstrate the continuing trust and respect Marty has earned from members of his synagogue and community. *See* Exh. 17.

   Marty stands before this Court ashamed of his crimes, disgraced in his former profession, and filled with grief for the pain he has caused his debilitated wife and the children who so vitally need his support in their lives.

## VII.   Conclusion

For the reasons set forth above, we ask that the Court reject the arguments and the contested facts set forth in the government's Sentencing Memorandum, that the Court proceed with sentencing as scheduled, and for the reasons set forth herein, and for all of the reasons set forth in Marty's initial Sentencing Memorandum and the attachments thereto, that the Court sentence Marty to a term of probation.

Dated: New York, New York
         June 14, 2013

Respectfully submitted,


George A. Stamboulidis                     Elkan Abramowitz
Lauren Resnick                             Richard F. Albert
Essence Liburd                             Morvillo Abramowitz Grand
Baker & Hostetler LLP                      Iason & Anello, P.C.
45 Rockefeller Plaza                       565 Fifth Avenue
New York, New York 10111                   New York, New York 10017